IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LINDSEY YEAGER, | ) | |
| Plaintiff, | ) | Civil Action No. 08-00893 |
| | ) | |
| v. | ) | |
| | ) | |
| UPMC HORIZON, | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

CONTI, District Judge.

Lindsey Yeager ("plaintiff" or "Yeager"), a former health education specialist for UPMC's Womancare Center, commenced this gender-based discrimination and retaliation action against her former employer, defendant UPMC Horizon ("defendant" or "Horizon"). Plaintiff asserts claims for (1) hostile work environment, gender-based discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1963, 42 U.S.C. §§ 2000e et seq. ("Title VII") (counts one and three), and (2) hostile work environment, gender-based discrimination, and retaliation in violation of the Pennsylvania Human Relations Act, 43 PA. CONS. STAT. §§ 951, et seq. ("PHRA") (counts two and four). Defendant filed a motion for partial summary judgment with respect to the PHRA claim for hostile work environment (count two) and plaintiff's retaliation claims (counts one, two, three, and four).

After considering the submissions of the parties, including the joint statement of material facts (Docket No. 42) ("J.S."), the court will grant defendant's partial motion for summary judgment with respect to plaintiff's claims asserted under the PHRA, and deny the motion with respect to plaintiff's Title VII retaliation claims to the extent she claims she was retaliated

against by defendant prohibiting her from working at home, which she was previously permitted to do.

### Factual Background

A.    **Introductory Facts**

The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

Plaintiff was employed briefly by defendant in 2005, and again employed from February 2006 until her termination on April 4, 2008.  (J.S. ¶ 1; Def.'s App. in Supp. of Mot. (Docket No. 32), Tab 1 ("Pl.'s Dep. (Docket No. 32)") at 32, 150.)  After working for one week in 2005, plaintiff returned to Horizon as a registered nurse ("RN") in the OB department on February 6, 2006. (J.S. ¶ 5; Pl.'s Dep. (Docket No. 32) at 49.)  During that time, she reported to Sue Lauffer ("Lauffer"), manager of the OB department.  (Id.)

Because plaintiff was having difficulty working with Lauffer, she approached Kimberly Leonard ("Leonard"), about job openings that might be available.  (J.S. ¶ 8; Pl.'s Dep. (Docket No. 32) at 61.)  Leonard was employed as defendant's director of nursing, defendant's assistant chief nursing officer, the director of Women's Health Services, and the director of the Womancare Center (J.S. ¶ 3; Def.'s App. in Supp. of Mot., Tab 2 ("Leonard Dep. (Docket No. 32)") at 9.)  Plaintiff was interviewed and selected by Leonard for the health education specialist position based in the Womancare Center.  (J.S. ¶ 9-10; Pl.'s Dep. (Docket No. 32) at 62, 71; Pl.'s Dep. (Docket No. 32), Ex. 12.)  Plaintiff started in the new position on December 10, 2006, at

which time she began reporting to Leonard.  (J.S. ¶ 12; Pl.'s Dep. (Docket No. 32) at 72, 74;

Pl.'s Dep. (Docket No. 32), Ex. 19.)  In that position, plaintiff was responsible for maternal

infant community education, staff development, private patient consultation, interfacing with

physician offices, advocacy for breastfeeding, and breastfeeding support groups.  (J.S. ¶ 10; Pl.'s

Dep. (Docket No. 32) at 62, Pl.'s Dep. (Docket No. 32), Ex. 12.)

**B.      Dr. Meyn and the Sexual Harassment Incidents**

Dr. Joseph Meyn ("Meyn") was a physician specializing in obstetrics and gynecology

and was employed at Horizon from June 2005 until March 2009.  (J.S. ¶ 4; Def.'s App. in Supp.

of Mot., Tab 6 ("Meyn Dep. (Docket No. 32)") at 10-12.)  Yeager first met Meyn while working

as a RN in the OB Department.  (J.S. ¶ 7; Pl.'s Dep. (Docket No. 32) at 57.)  Beginning in

October 2006, Yeager began dating Meyn, although plaintiff testified that the relationship was

not consensual.  (J.S. ¶ 14; Pl.'s App. in Opp. of Mot. (Docket No. 36), Ex. 1 ("Pl.'s Dep.

(Docket No. 36)") at 58, 75-76.)  Yeager telephoned Meyn and sent him electronic text

messages, but Meyn "would just keep calling and bothering me.  It wouldn't matter what time it

was or what month it was."  (J.S. ¶ 15, 16; Pl.'s Dep. (Docket No. 36) at 75-76.)

Leonard telephoned plaintiff on November 22, 2006 to offer her the position of health

education specialist.  (J.S. ¶ 11; Pl.'s Dep. (Docket No. 36) at 71; Pl.'s Dep. (Docket No. 36), Ex.

66.)  Plaintiff received a text message on the same day from Meyn which stated, "Congrats.  You

have the lactation consultant job.  Act surprised when they tell you.  You owe me.  Big time.

Happy turkey day!  JW."  (Id.)  Leonard told plaintiff not to worry about the written warning that

Lauffer had issued to her as Leonard was getting rid of Lauffer.  (J.S. ¶ 23(f); Pl.'s Dep. (Docket

No. 36) at 213.)  Meyn made a similar representation to plaintiff.  (Id.)  After plaintiff was

selected for the health education specialist position, Meyn told her that she was to have sexual intercourse with Leonard and him.  (J.S. ¶ 23(d); Pl. Dep. (Docket No. 36) at 116.)

Shortly before Christmas in 2006, Meyn gave Leonard a substantial gift.  (J.S. ¶ 23(b); Pl.'s Dep. (Docket No. 36) at 105-06.)  Upon receiving the gift, Leonard stated in front of the entire staff that she was surprised she was the one who received the gift, as plaintiff was the one who was sleeping with Meyn.  (Id.)  Meyn occasionally went to Leonard's office to talk to her. (J.S. ¶ 23(c); Pl.'s App. in Opp. of Mot., Ex. 2 ("Meyn Dep. (Docket No. 36)") at 44-45; Pl.'s App. in Opp. of Mot., Ex. 4 ("Leoanrd Dep. (Docket No. 36)") at 30.)  On one occasion, Leonard got angry at plaintiff for interrupting a discussion between Leonard and Meyn.  (Id.)[1]

Plaintiff gave Meyn oral sex on four occasions:  three times between October and November 2006 and once on or around March 6, 2007.  (J.S. ¶ 19; Pl.'s Dep. (Docket No. 36) at 77.)  On all four occasions, the acts of oral sex were against plaintiff's will.  (J.S. ¶ 19; Pl.'s Dep. (Docket No. 36) at 76-79.)  From the beginning of the nonconsensual relationship, plaintiff had informed Meyn that his advances were not wanted.  (J.S. ¶ 19; Pl.'s Dep. (Docket No. 36) at 79-80.)  During the March 2007 incident, Meyn removed plaintiff's clothing from above the waist, and attempted to remove the rest of her clothing.  (J.S. ¶ 19; Pl.'s Dep. (Docket No. 36) at 77-80.)  Meyn pinned plaintiff, who was crying and protesting, to the bed.  (Id.)

Plaintiff did not go to the police after any of the occurrences of oral sex with Meyn.  (J.S. ¶ 19; Pl.'s Dep. (Docket No. 36) at 79.)  Plaintiff asserts that Meyn is an avid gun collector with well over 200 weapons in his collection.  (J.S. ¶ 20; Meyn Dep. (Docket No. 36) at 25-26.)

---

[1] The following facts are asserted by defendant and disputed by plaintiff:  Meyn did not give Leonard any feedback or pressure her to give plaintiff a performance improvement plan (J.S. ¶ 30; Meyn Dep. (Docket No. 32) at 61-62); no physicians, including Meyn, provided any input into plaintiff's performance improvement plan, (J.S. ¶ 30; Leonard Dec. (Docket No. 32) ¶ 7); and the performance improvement plan was the result of plaintiff's performance problems as observed by Leonard, and not of any input from Meyn.  (J.S. ¶ 30; Leonard Dec. (Docket No. 32) ¶ 8.)

When Meyn showed his collection to plaintiff, he told her words to the effect that "he gets rid of whoever he doesn't like." (J.S. ¶ 20; Pl.'s Dep. (Docket No. 36) at 209, 217.) Meyn conveyed to plaintiff that he had been responsible for getting rid of a number of people in the hospital. (J.S. ¶ 20; Pl.'s Dep. (Docket No. 36) at 209-10.)

On March 18, 2007, Meyn sent plaintiff a number of text messages that, in summary, stated that he was intensely attracted to plaintiff, he rebuked her for not wanting to make love, she would like the things he would do to her to the point that she would become addicted, and the next time he sees her they will be doing more than cuddling. (J.S. ¶ 54; Pl.'s Dep. (Docket No. 36) at 220-21; Pl.'s Dep. (Docket No. 36), Ex. 66.)

**C.     Evaluations**

Plaintiff's performance as an RN in the OB department was reviewed by Lauffer through a performance improvement plan on July 14, 2006, and a performance management review on August 6, 2006. (J.S. ¶ 6; Pl.'s Dep. (Docket No. 32), Exs. 10, 11.) Plaintiff contends that one criticism made in the performance improvement plan concerning an inappropriate statement plaintiff made about the OB department to individuals in another department did not occur. (Pl.'s Dep. (Docket No. 36) at 52.)

In June 2007 plaintiff started having problems with Leonard while working as the health education specialist. (J.S. ¶ 57; Pl.'s Dep. (Docket No. 36) at 63.) Plaintiff was issued a corrective action by Leonard on June 8, 2007, which noted plaintiff's performance issues were: "(1) unprofessional behavior/poor impulse control/reactionary; (2) inability to work with co-worker towards common goal; (3) difficulty accepting criticism from manager/supervisor." (J.S. ¶ 22; Pl.'s Dep. (Docket No. 32), Ex. 22; Def.'s App. in Supp. of Mot., Tab 3 ("Leonard Dec. (Docket No. 32)") ¶ 3.) The first two performance issues in the corrective action relate to

personal conflicts with plaintiff and her co-worker, Dona Householder ("Householder").  (J.S. ¶ 22(a); Pl.'s Dep. (Docket No. 32), Ex. 22.)  Householder received a corrective action from Leonard on April 16, 2007 for violation of department work rules and policies.  (J.S. ¶ 22(a); Def.'s Supplemental App. in Supp. of Mot. (Docket No. 40), Tab 1 ("2nd Leonard Dec. (Docket No. 40)"), Ex. A ¶ 3.)  The written warning resulted, in part, from issues relating to the ongoing conflict with plaintiff.  (2nd Leonard Dec. (Docket No. 40), Ex. A ¶ 4.)

On the same day that plaintiff received the corrective action, she also received a performance management review rating her overall performance as a 2.05 out of 3.  (J.S. ¶ 25; Pl.'s Dep. (Docket No. 32), Ex. 24.)  Over the next two months, defendant determined that plaintiff's performance did not improve, and on August 7, 2007, plaintiff was issued a performance improvement plan.  (J.S. ¶ 27; Leonard Dec. (Docket No. 32) ¶ 6; Pl.'s Dep. (Docket No. 32) at 101; Pl.'s Dep. (Docket No. 32), Ex. 27.)  In the performance improvement plan, Leonard noted that there had been "no real improvement" since June 2007 and that there had been inconsistencies with plaintiff's time sheet.  (J.S. ¶ 28; Leonard Dec. (Docket No. 32) ¶ 6; Leonard Dec. (Docket No. 32), Ex. C.)  Under "Description of the incident" Leonard wrote:

> Corrective Action Form 6-8-07 regarding unprofessional/reactionary behavior.  Meeting weekly with no real improvement.  Frequently leaves work crying 'I can't do anything right.'  7-31-07 Responded negatively to an e-mail sent to her reminding her to be respectful.  Talked about incident to physician's coworkers.  In addition, inconsistencies with time sheet.

(J.S. ¶ 29; Leonard Dec. (Docket No. 32), Ex. C.)

Meyn never gave plaintiff a performance review, he did not observe plaintiff clinically, and never supervised her.  (J.S. ¶ 13; Pl.'s Dep. (Docket No. 32) at 84; Meyn Dep. (Docket No. 32) at 61-62.)

**D.      Reporting and Filing of Discrimination Charges**

Yeager first reported Meyn's sexual harassment to Durniok on June 8, 2007 after receiving a corrective action.  (J.S. ¶ 26; Pl.'s Dep. (Docket No. 32) at 104.)  Plaintiff repeated her complaint to Durniok on July 3, 2007.  (J.S. ¶ 26; Pl.'s Dep. (Docket No. 36) at 117-18, 207-08.)  During the July 3, 2007 meeting with Durniok, plaintiff relayed the content of text messages and voice mails that Meyn left her.  (J.S. ¶ 26; Pl.'s Dep. (Docket No. 36) at 104, 207-08.)

Plaintiff reported to Leonard on or about August 7, 2007, that she was having problems with Meyn, because he was making sexual advances toward her.  (J.S. ¶ 26; Pl.'s Dep. (Docket No. 36) at 117-18.)  Leonard responded to plaintiff by threatening her employment, saying, "you can either resign or I will terminate you and ruin your employee file, it's your choice."  (Pl.'s Dep. (Docket No. 36) at 118.)  Plaintiff complained to Durniok regarding this statement made by Leonard.  (J.S. ¶ 60; Pl.'s Dep. (Docket No. 36) at 118.)  Durniok instructed plaintiff that "nobody gets terminated without me saying so."  (Id.)  On the same day, plaintiff was issued a performance improvement plan.  (J.S. ¶ 27; Leonard Dec. (Docket No. 32) ¶ 6; Pl.'s Dep (Docket No. 32), Ex. 27.)

On September 11, 2007, Durniok received a fax from plaintiff containing a charge of discrimination to be filed by plaintiff with the Equal Employment Opportunity Commission ("EEOC").  (J.S. ¶ 32; Durniok Dep. (Docket No. 32) at 39; Durniok Dep. (Docket No. 32), Ex. 4.)  On September 13, 2007, Durniok met with Meyn and informed him that plaintiff made a complaint of sexual harassment against him and questioned him about the allegations; Meyn was

instructed to no longer have any contact with plaintiff and to inform Durniok if she contacted him.  (J.S. ¶ 34; Meyn Dep. (Docket No. 36) at 35, 50-51; Durniok Dep. (Docket No. 32) at 30.)

On September 17, 2007, plaintiff signed a document titled "Information for Complaints & Election Option to Dual File with the Pennsylvania Human Relations Commission" ("PHRC").  (J.S. ¶ 36; Docket No. 32, Tab 7 ("Myers Dec. (Docket No. 32)") ¶ 4; Myers Dec. (Docket No. 32), Ex. A.)  The form provided:

> If you want your charge filed with PHRC, including this form as
> part of your EEOC charge, with your signature under the
> verification below, will constitute filing with PHRC.

(Id.)

On September 20, 2007, the EEOC transmitted plaintiff's charge of discrimination to the PHRC.  (J.S. ¶ 36; Myers Dec. (Docket No. 32) ¶ 4; Myers Dec. (Docket No. 32), Ex. B.) This transmission letter stated that the charge of employment discrimination (EEOC Charge No. 533-2007-01785) was initially received by the EEOC on September 14, 2007.  (Myers Dec. (Docket No. 32), Ex. B.)

On September 25, 2007, plaintiff filed a second charge of discrimination alleging that she was retaliated against because she filed her first charge of discrimination.  (J.S. ¶ 38; Pl.'s Dep. (Docket No. 36), Ex. 45.)  On or about April 15, 2008, plaintiff filed her final EEOC charge of discrimination alleging that her termination was in retaliation for her prior protected activity. (J.S. ¶ 53; Pl.'s Dep. (Docket No. 32), Ex. 48.)

**E.    Alleged Retaliation Incidents**

Plaintiff alleged that the following incidents occurred in retaliation for filing her original charge and complaining about sexual harassment:  (1) she received emails from Leonard; (2) after the EEOC complaint was faxed to Horizon on September 11, 2007, Leonard invited Meyn to eat lunch during a staff meeting at the Womancare Center and Meyn took the only open seat

which was next to plaintiff; (3) she was forced onto a medical leave; and (4) she was contacted, during her leave, by Marsha Solo ("Solo") and asked to close the Womancare Center because plaintiff had keys.  (J.S. ¶ 39; Pl.'s Dep. (Docket No. 32) at 130-36.)  Plaintiff admitted that she does not know whether Solo, a nurse, knew that plaintiff filed a charge of discrimination when she telephoned plaintiff with respect to closing the Womancare Center.  (J.S. ¶ 40; Pl.'s Dep. (Docket No. 32) at 135.)

After plaintiff first alerted Leonard to her complaint against Meyn, Leonard sent emails related to inconsistencies in plaintiff's time sheet and mileage.  (J.S. ¶ 41; Pl.'s Dep. (Docket No. 32), Exs. 29, 33, 34.)  One of the emails dated September 12, 2007, not only addressed alleged problems with plaintiff's time sheets, but also informed plaintiff that she is no longer to work from home and should only record hours spent at the Womancare Center or the Birth Place.  (J.S. ¶ 41; Pl.'s Dep. (Docket No. 36) at 110-11; Pl.'s Dep. (Docket No. 32), Ex. 33.)  Plaintiff previously was allowed to work from home.  (J.S. ¶ 41; Pl.'s Dep. (Docket No. 36) at 113.)  Plaintiff was working as a single parent and taking classes in a master's program.  (Pl.'s Dep. (Docket No. 36) at 113-14; Pl.'s Br. in Opp. to Def.'s Mot. (Docket No. 34) at 12.)  Plaintiff stated that Leonard knew and implicitly approved of the problems with plaintiff's time sheets long before Leonard sent the email, whereas defendant asserts that the inconsistencies in plaintiff's time sheet were raised on August 7, 2007 in plaintiff's performance improvement plan.  (J.S. ¶ 41; Pl.'s Dep. (Docket No. 36) at 113-14; Pl.'s Dep. (Docket No. 32), Ex. 27.)

F.     **Family Medical Leave, Personal Leave, and Termination**

On September 14, 2007, plaintiff sent Leonard an email informing her that she was going home from work for the day.  (J.S. ¶ 35; Leonard Dec. (Docket No. 32) ¶ 11.)  That day was the last day that plaintiff actually worked for defendant.  (Id.)  Plaintiff subsequently sought medical

treatment for the emotional harm that she was suffering as a result of the alleged harassment, first at the emergency room and then through a counselor.  (J.S. ¶ 35; Pl.'s Dep. (Docket No. 36) at 85-86, 177-95.)  Plaintiff's physician issued a "Certificate to Return to Work/School" slip dated September 17, 2007, indicating that plaintiff would be indefinitely off work.  (J.S. ¶ 35; Pl.'s Dep. (Docket No. 36) at 144; Pl.'s Dep. (Docket No. 36), Ex. 51.)

On December 10, 2007, plaintiff was sent a letter by Leonard which stated:

> You have been on Family and Medical Leave since September 28, 2007; this leave of absence will expire on December 21, 2007.  I am enclosing a form for you to request a Personal Leave of Absence at the expiration of your FMLA on December 21, 2007. The Personal LOA provides a fourteen (14) week extension at the end of the Family and Medical Leave if necessary.

(J.S. ¶ 42; Pl.'s Dep. (Docket No. 32) at 144-45; Pl.'s Dep. (Docket No. 32), Ex. 52.)  Plaintiff requested and was granted a personal leave of absence.  (J.S. ¶ 43; Pl.'s Dep. (Docket No. 32) at 145-47; Pl.'s Dep. (Docket No. 32), Ex. 53.)

On February 26, 2008, Durniok sent a letter to plaintiff reminding her that UPMC employees are eligible for only twenty-six weeks of leave in a rolling year, and that her combined twelve-week FMLA leave and fourteen-week personal leave were to expire on March 28, 2008.  (J.S. ¶ 44; Pl.'s Dep. (Docket No. 32) at 149; Pl.'s Dep. (Docket No. 32), Ex. 56.) Failure of plaintiff to return to work by March 28, 2008 would result in termination of employment and removal from UPMC payroll.  (Id.)  This letter was sent in compliance with Horizon's leave of absence policy.  (J.S. ¶ 44; Durniok Dec. (Docket No. 32), Ex. C.)

On March 5, 2008, plaintiff's counsel sent a fax to Durniok and others, stating

> Release to Return to work at UPMC—"another facility"— (Response to Letter of termination if not returning).  Kindly advise Ms. Yeager of the proposed facility—(not Hermitage)—that UPMC intends to have Lindsey return to effective 4/1/08!

(J.S. ¶ 45; Durniok Dep. (Docket No. 32) at 44; Durniok Dep. (Docket No. 32), Ex. 7; Durniok

Dec. (Docket No. 32) ¶ 7.)  The second page of the fax was a note from Dr. Susan Drolet, a

clinical psychologist, which stated:

> Lindsey Yeager is not to return to work at this time.  Her problems
> with depression and anxiety are a direct result of the harassment
> and hostile work environment at UPMC Horizon.  Ms. Yeager is
> targeted to return to work the last week in March.  However, due to
> the aforementioned work environment at the Woman Care Center
> she will need to be placed at another facility.

 (J.S. ¶ 46; Durniok Dec. (Docket No. 32) ¶ 7; Durniok Dep. (Docket No. 32), Ex. 7.)

When plaintiff failed to return to work on March 28, 2008, Durniok sent plaintiff a letter

dated April 4, 2008 informing Yeager that her employment was terminated pursuant to the

personal leave of absence policy.  (J.S. ¶ 47; Durniok Dec. (Docket No. 32) ¶ 8; Durniok Dec.

(Docket No. 32), Ex. C.)  Durniok stated that plaintiff's not returning to work was considered a

voluntary resignation and her employment was being terminated in accordance with the personal

leave of absence policy.  (J.S. ¶ 48; Durniok Dep. (Docket No. 32) at 47.)

Plaintiff's position as the health education specialist was at the Womancare Center

located in Hermitage, Pennsylvania, which is a stand-alone facility dedicated to women's health.

(J.S. ¶ 49; Durniok Dec. (Docket No. 32) ¶ 9.)  Durniok does not have the authority to transfer or

relocate employees outside of Horizon to other business units.  (J.S. ¶ 50; Durniok Dec. (Docket

No. 32) ¶ 10.)  Durniok could not recall whether he discussed the decision to terminate plaintiff's

employment with his superior, Joel Yuhas.  Prior to the expiration of her personal leave of

absence, plaintiff did not bid on any open position at Horizon.  (J.S. ¶ 51; Durniok Dec. (Docket

No. 32) ¶ 11.)

Plaintiff was prepared to go back to work for UPMC in March 2008.  (J.S. ¶ 55; Pl.'s

Dep. (Docket No. 36) at 205.)  Meyn was not reassigned; rather, he voluntarily left his

employment at Horizon in March 2009 for a better opportunity.  (J.S. ¶ 56; Meyn Dep. (Docket No. 36) at 12-13, 55-56.)

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  Id. at 249.  The court is to draw all reasonable inferences in favor of the nonmoving party.  El v. Southeastern Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party.")  The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept
> a moving party's necessary propositions of fact, pre-trial judgment
> cannot be granted.  Specious objections will not, of course, defeat a
> motion for summary judgment, but real questions about credibility,
> gaps in the evidence, and doubts as to the sufficiency of the
> movant's proof, will.

Id.  The court may consider any material evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment.  Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL

PRACTICE AND PROCEDURE § 2721, at 40 (2d ed. 1983)); <u>Pollack v. City of Newark</u>, 147 F. Supp.
35, 39 (D.N.J. 1956), <u>aff'd</u>, 248 F.2d 543 (3d Cir. 1957) ("in considering a motion for summary
judgment, the court is entitled to consider exhibits and other papers that have been identified by
affidavit or otherwise made admissible in evidence").

### *Discussion*

Defendant asserts and plaintiff disputes that plaintiff's termination was entirely unrelated
to her complaints of sexual harassment or any of her EEOC charges of discrimination.
Defendant argues plaintiff's termination resulted from her failure to return to work.  Plaintiff
asserts and defendant disputes that plaintiff's inability to return to work at the Womancare
Center was the direct result of the harassment she experienced prior to her leave of absence.

Plaintiff alleges that she was subjected to a hostile work environment because of her sex
and retaliated against for engaging in protected activity in violation of Title VII and the PHRA.
Defendant moves for partial summary judgment with respect to plaintiff's hostile work
environment claim brought pursuant to the PHRA, and plaintiff's retaliation claims brought
pursuant to Title VII and the PHRA.[2]

### I.    Hostile Work Environment Claim Brought Pursuant to the PHRA

#### A. 180-Day Statute of Limitations Period

Defendant argues that plaintiff's PHRA claim based upon a hostile work environment
should be dismissed because it was filed more than 180 days after the last event constituting
sexual harassment.  To bring suit under the PHRA for a hostile work environment claim, a

---

[2] The analysis required for adjudicating plaintiff's claim under the PHRA is identical to a Title VII inquiry.
<u>Scheidemantle v. Slippery Rock Univ.</u>, 470 F.3d 535, 539 n.5 (3d Cir. 2006); <u>Goosby v. Johnson & Johnson
Medical</u>, 228 F.3d 313 (3d Cir. 2000).  The resolution of plaintiff's retaliation claims under Title VII will be
dispositive of plaintiff's retaliation claims under the PHRA.

plaintiff must first file an administrative complaint with the PHRC within 180 days after the alleged act of discrimination. 43 PA. CONS. STAT. § 959(a), (h). If a plaintiff fails to file a timely complaint with the PHRC, then he or she is precluded from judicial remedies under the PHRA. Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997), cert. denied, 522 U.S. 914 (1997). Pennsylvania courts have strictly interpreted this time requirement, and have repeatedly held that "persons with claims that are cognizable under the Human Relations Act must avail themselves of the administrative process of the Commission or be barred from the judicial remedies authorized in Section 12(c) of the Act." Woodson, 109 F.3d at 925 (citing Vincent v. Fuller Co., 616 A.2d 969, 974 (Pa. 1992)).

The crux of the issue here is whether the work-sharing agreement and the agency relationship created between the EEOC and the PHRC, (Pl.'s Surreply Br. in Opp. to Def.'s Mot. (Docket No. 41), Ex. 2 ("Work Sharing Agreement") § II(A)), will affect the general rule that a complaint is deemed filed with the PHRC on the date received by the PHRC, 16 PA. CODE § 42.14(c). Section II(A) of the work-sharing agreement provides that the "EEOC's receipt of charges on the [PHRC]'s behalf will automatically initiate proceedings of both the EEOC and the [PHRC] for the purposes of Section 706 (c) and (e) (1) of Title VII." (Work Sharing Agreement § II(A).) The document signed by plaintiff titled "Information for Complainants & Election Option to Dual File with the Pennsylvania Human Relations Commission" stated that "including this form as part of your EEOC charge, with your signature under the verification below, will constitute filing with PHRC." (Myers Dec. (Docket No. 32), Ex. A.)

Defendant relies on Woodson, where the court of appeals rejected plaintiff's argument that simply filing a complaint with the EEOC can initiate PHRC proceedings as required by the PHRA. Woodson, 109 F.3d at 926. In Woodson, however, the plaintiff did not mark a box for

14

the EEOC to cross-file his charge with the PHRC.  The court noted the Pennsylvania decision in

Vincent v. Fuller Co., 616 A.2d 969 (Pa. 1992), which recognized that "the PHRA filing

requirement is satisfied if the EEOC forwards a charge to the PHRC."  Woodson, 109 F.3d at

926 n.12 (citing Vincent, 616 A.2d at 971).  Tellingly the court commented:

> we note that [the plaintiff's] case would be quite different if he had
> marked the box for the EEOC to cross-file and the EEOC had
> failed to transmit the charge because of a breakdown in the
> administration system.  As that case is not before us, however, we
> do not decide it here.

Id.  The court also commented that "[w]hether a plaintiff has initiated PHRC proceedings under

the PHRA is a state law issue."  Id. at 926-27.  Prior to the work-sharing agreement, the

Pennsylvania Superior Court held that the filing requirements of the PHRA are satisfied when

the EEOC transmits the EEOC charge to the PHRC.  See Lukus v. Westinghouse Elec. Corp.,

419 A.2d 431 (Pa. Super. Ct. 1980).[3]

Defendant relies on Barb v. Miles, Inc., 861 F. Supp. 356, 361 (W.D. Pa. 1994), to

support its position that a plaintiff will be deemed to have filed a complaint with the PHRC only

on the date the PHRC receives a copy of plaintiff's EEOC charge.  Barb cites Lukus and Vincent

for the basis of its holding.  As noted, Lukus did not address the effect of the work-sharing

agreement.  Vincent, likewise, did not address the effect of the work-sharing agreement.  The

charge in Vincent was filed with the EEOC in 1983, one hundred days after the alleged

discriminatory conduct.  The EEOC transmitted the charge to the PHRC. The filing with the

EEOC, however, was not timely for PHRA purposes, because at that time there was a ninety-day

time limit under Pennsylvania law for the filing of a PHRA complaint.  Vincent, 616 A.2d at

---

[3] In Lukus, under the applicable statute an EEOC charge could not be filed until the state proceedings were
terminated.  The EEOC transmitted Lukus' complaint to the PHRC requesting the PHRC terminate the PHRC
proceedings and return jurisdiction to the EEOC.  Lukus, 419 A.2d at 452.  Unlike this case, there was no dual filing
at issue in Lukus.

971.  The court in <u>Barb</u> did not cite to any authority dealing with a dual filing under the work-sharing agreement and this court finds the conclusion in <u>Barb</u> unpersuasive with respect to the issue raised here.

Plaintiff argues that the court should consider the original filing of the charge with the EEOC on September 11, 2007 as the date upon which the PHRC received the charge. Plaintiff relies on <u>Berkoski v. Ashland Regional Medical Center</u>, 951 F. Supp. 544 (M.D. Pa. 1997), <u>aff'd</u>, 205 F.3d 1328 (3d Cir. 1999), for the proposition that a charge of discrimination which is only filed with either the state or federal agency is deemed to be filed with the other agency at the very same moment.  In <u>Berkoski</u>, the plaintiff's original filing was made with the PHRC. <u>Berkoski</u>, 951 F. Supp. at 546.  In that filing the plaintiff made a simultaneous election to dual file with the EEOC.  <u>Id.</u> at 547.  The court held that "[g]iven the worksharing agreement . . . coupled with [plaintiff]'s request for dual filing, the PHRC instantaneously waived its exclusive jurisdiction on the moment the charge was filed . . . [and] the charge was deemed filed with the EEOC at the same moment."  <u>Id.</u> at 550.  The court, however, did not address a situation, like here, where the plaintiff failed to indicate affirmatively his choice to dual file the complaint at the time it was first filed.[4]

Plaintiff relies on a fax cover sheet to demonstrate that plaintiff intended to file her first EEOC complaint via facsimile on September 11, 2007, and that she intended to simultaneously send a carbon copy of that transmission to the PHRC.  (Durniok Dep. (Docket No. 32), Ex. 4.) Plaintiff, however, did not attach any "Transmission Verification Report[s]" for this fax.  The

---

[4]  Plaintiff also cites to the fact section of <u>Hohider v. UPS, Inc.</u>, No. 04-363, 2005 WL 3533701, at *1 (W.D. Pa. Dec. 23, 2005), an unpublished memorandum issued by this court.  In <u>Hohider</u>, the court did not consider the issue raised here where the dual-filing election is not made at the time the initial charge is filed.  In <u>Hohider</u> the court noted:  "Pursuant to a work-sharing agreement between the PHRA and EEOC, charges filed with one agency are deemed to be filed with the other on the same date and will initiate proceedings at both agencies."  <u>Hohider</u>, 2005 WL 3533701 at *1. The court for clarity should have added the phrase, "provided the claimant elects dual-filing."

court notes that plaintiff submitted as exhibits Transmission Verification Reports for a different

facsimile sent to defendant on March 5, 2008.  (Durniok Dep. (Docket No. 32), Ex. 7.)  Contrary

to plaintiff's assertion, EEOC records indicate that the date it received the first complaint with

respect to EEOC Charge No. 533-2007-01785 was on September 14, 2007. [5]  It is undisputed that

plaintiff elected to dual file her EEOC charge of discrimination with the PHRC on September 17,

2007.  The EEOC transmitted the original charge on September 20, 2007.

Plaintiff's charge filed with the EEOC is dated September 11, 2007.  The EEOC charge

itself failed to convey plaintiff's intention to dual file it with the PHRC.  Looking beyond the fax

cover sheet, the charge failed to make any mention of the PHRC.  The charge mentioned the

PHRA in one sentence: "I believe [defendant] discriminated against me because of my gender

(female) in violation of Title VII as to gender discrimination and the PHRA."  (Durniok Dep.

(Docket No. 32), Ex. 4.)

Plaintiff directs the court's attention to the work-sharing agreement and the agency

relationship created between the EEOC and the PHRC to establish September 11, 2007 as the

date upon which the PHRC received the charge.  The PHRC and the EEOC entered into an

agreement through which they apportioned initial jurisdiction over discrimination complaints in

order to avoid unnecessary duplication of investigatory time and effort.  Woodson, 109 F.3d at

925.  Through the work-sharing agreement, Pennsylvania waived its statutory right to process

initially discrimination claims, and this agreement operates to "terminate" the PHRC proceedings

with respect to those complaints that are filed first with the EEOC.  Woodson, 109 F.3d at 926

(citing Trevino-Barton v. Pittsburgh Nat'l Bank, 919 F.2d 874, 879 (3d Cir. 1990)).  Thus, "the

_____

[5] The September 20, 2007 EEOC letter transmitting the charge of employment discrimination to the PHRC stated that the charge was initially received on September 14, 2007.  (Myers Dec. (Docket No. 32), Ex. B.)  There is no evidence of record that a charge was received by any agency on September 11, 2007.

worksharing agreement allows a plaintiff to proceed in court under Title VII without first filing

with the PHRC." Woodson, 109 F.3d at 926.

 The language of the work-sharing agreement and the form electing to dual file suggest

that when a plaintiff dual files with the EEOC and the PHRC, the complaint will be deemed filed

with both agencies on the date the election to dual file the charge is made.[6]  Section II(A) of the

work-sharing agreement in effect at the relevant time read:

---

[6] The court also observes that the PHRC's policy manual in effect at the pertinent time included a policy statement
that also suggests that, if the filer elects to dual file, the charge is deemed filed with both agencies on the same date.
Policy No. 00-01 concerns the subject "Disposition of Cases Initially Filed with EEOC ('Lukus' Cases)" and is
dated December 18, 2000; Policy No. 00-01 provides that:

> Where the complainant has initially filed with the Equal Employment
> Opportunity Commission (EEOC), and wishes to dual file with the Pennsylvania
> Human Relations Commission (PHRC), the following policy will govern the
> processing of these complaints.
>
> 1. PHRC will deem the complaint filed on the date that the charge is filed with
> EEOC if:
>
>  a. There is an existing agreement between PHRC and EEOC whereby
> each agency designates the other as its agent for the purpose of receiving and
> drafting charges/complaints; **and**
>
>  b. The EEOC charge contains sufficient particulars to meet the
> requirements for a complaint filed under section 9 of the Pennsylvania Human
> Relations Act (PHRA), 43 P.S. § 959 (a); **and**
>
>  c. An "Information for Complainant & Election Option to Dual File with
> the Pennsylvania Human Relations Commission" form, containing information as
> to the complainant's right to file with PHRC, the effect of choosing EEOC as the
> investigatory agency on the PHRC complaint investigation process, language
> specifically stating that the complainant elects to file with PHRC and wants the
> form and verification incorporated into the EEOC complaint form and filed as the
> complainant's PHRC complaint, the same verification language as is contained in
> the PHRC complaint form, followed by the complainant's signature and the date
> of the signature, or a Proposed Revision of PHRC Statement of Policy No. 96-01
> All PHRC Commissioners, Executive Director, Division and Regional Directors
> and All PHRC Attorneys comparable form containing this information is attached
> to the EEOC charge.

Pennsylvania Human Relations Commission Policy Manual (Sept. 1, 2007), http://sites.state.pa.us/PA_Exec/PHRC/
legal/forms/POLICY%20MANUAL%20091907.pdf (last visited Mar. 10, 2010).  At least one court analyzed this
policy in addressing the timeliness of a charge with the PHRC.  See Baird v. Outlook Pointe, No. 4:07-CV-1580,
2008 WL 4287382, at *4 (M.D. Pa. Sept. 17, 2008) (considering the requirements of "PHRC Operating Policy 00-
01" for determining whether a charge is timely filed).  This court, however, can not view the policy manual as
binding in this case.  The manual includes a disclaimer providing:

> In order to facilitate the assertion of employment rights, the EEOC and the [PHRC] each designate the other as its agent for the purpose of receiving and drafting charges, including those that are not jurisdictional with the agency that initially receives the charges.  EEOC's receipt of charges on the [PHRC]'s behalf will automatically initiate the proceedings of both EEOC and the [PHRC] for the purposes of Section 706 (c) and (e) (1) of Title VII. This delegation of authority to receive charges does not include the right of one Agency to determine the jurisdiction of the other Agency over a charge.  Charges can be transferred from one agency to another in accordance with the terms of this agreement or by other mutual agreement.

(Work Sharing Agreement § II(A).)[7]  This work-sharing agreement established an agency

relationship between the PHRC and EEOC for purposes of receiving charges related to

---

> The policies and procedures outlined in this policy manual are intended to supplement existing statutory and regulatory requirements. Nothing in the policies or procedures shall affect statutory or regulatory requirements. The policies and procedures herein are not an adjudication or a regulation. They are nonbinding guidelines which indicate the manner in which the Pennsylvania Human Relations Commission ("PHRC") intends to exercise its administrative discretion in the future, unless it is convinced otherwise during the course of a specific proceeding.

> To this end, the policy guidelines contained in this policy manual are not binding and may be deviated from whenever the PHRC believes that any statute or regulation requires it, or that it is otherwise appropriate to do so. No policy guidance may be cited as authority for any PHRC ruling, adjudication or other binding action. The legal rationales set forth in a policy may be cited as the basis for PHRC binding action to the extent that the PHRC believes the rationale is valid in the context of the specific proceeding.

Pennsylvania Human Relations Commission Policy Manual (Sept. 1, 2007), supra.  Given this disclaimer, the policies set forth in the manual have no binding effect on the PHRA's statutory filing requirements codified at 43 PA. CONS. STAT. § 959(a), (h) and 16 PA. CODE § 42.14(c).

[7] The work-sharing agreement between the PHRC and the EEOC for fiscal year 2008 was amended on January 25, 2008, by adding language to section II(A), which provides:  "The EEOC and the FEPA, consistent with the mutual designation of each other as their agent for receipt of charges, deem charges that are dual filed with the other Agency as being filed with the non-originating agency as of the date initially received by the originating agency." (Work Sharing Agreement § II(A).)  This language suggests that claims filed after the date of this amendment would be deemed received for timeliness purposes on the date received by the first agency; provided there is an election by the filer to dual file.  This language clarifies the intent of the agencies to each act as an agent for the other in situations where there in an election made by the filer to dual file.

employment rights.  The EEOC, as the PHRC's agent, was authorized to receive a charge that otherwise would have to be directly received by the PHRC.

Under agency principles, the rules for the interpretation of contracts apply to agency agreements.  See RESTATEMENT (SECOND) AGENCY § 32 ("the rules for the interpretation of contracts apply to the interpretation of authority").  Pursuant to the contract between the parties, i.e. the work-sharing agreement, charges received by the EEOC "on the [PHRC]'s behalf" initiated PHRC proceedings.  (Work Sharing Agreement § II(A).)  There is no evidence of record that the EEOC received a charge on behalf of the PHRC on September 14, 2007.  Plaintiff failed to indicate that she was electing to dual file her EEOC charge with the PHRC in the charge dated September 11, 2007; plaintiff failed to make any reference to the PHRC in that charge.  The only mention of the PHRC in documents dated September 11, 2007 is the indication of a carbon copy to the PHRC on the fax cover sheet, but there is no evidence of record showing that this cover sheet was sent to the PHRC.

The EEOC received plaintiff's election to dual file with the PHRC on September 17, 2007, which was evidenced by plaintiff signing and submitting to the EEOC a form to that effect. The need for a plaintiff to initiate the dual filing is clear from the instruction that, "including this form as part of your EEOC charge, with your signature under the verification below, will constitute filing with PHRC."  (Myers Dec. (Docket No. 32), Ex. A.)  For purposes of timely filing under 43 PA. CONS. STAT. § 959(a), (h) and 16 PA. CODE 42.14(c), plaintiff's first charge of discrimination was received and filed with the PHRC on the date she elected to dual file. September 17, 2007 is the pertinent date to be utilized to determine whether the charge was filed 180 days after the alleged act of discrimination occurred.

Viewing the facts in the light most favorable to the nonmoving party, the court finds that the last alleged act of sexual harassment occurred on March 18, 2007.  On that date Meyn sent several text messages of an overtly sexual and arguably harassing nature to the plaintiff.  A reasonable jury could find that these text messages were part of the same alleged sexual harassment that Meyn engaged in since October 2006.  There is no evidence of sexual harassment by Meyn after that date and no allegations anyone else *sexually* harassed plaintiff after that date.  See discussion infra pp. 24-25.

Counting forward 180 days from March 18, 2007, plaintiff's PHRA claim needed to be deemed filed on or before September 14, 2007.  Plaintiff, however, elected to dual file on September 17, 2007 and her PHRA charge of discrimination was not timely filed.

**B.  Equitable Tolling and the Continuing Violation Doctrine**

16 PA. CODE § 42.14(a) provides that "the computation of the 180 days does not include a period of time which is excludable as a result of waiver, estoppel or equitable tolling."  16 PA. CODE § 42.14(a).  There are three typical situations where courts have permitted equitable tolling.

First, equitable tolling will be "allowed where the plaintiff actively pursues his [or her] judicial remedies but files a defective pleading during the statutory period, such as filing in the wrong forum."  Altopiedi v. Memorex Telex Corp., 834 F. Supp. 800, 806 (M.D. Pa. 1993) (citing Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 94-97 (1990); Kocian v. Getty Refining & Marketing Co., 707 F.2d 748, 753 (3d Cir. 1983), cert. denied, 464 U.S. 852 (1983)).  Second, equitable tolling will be recognized "where the deadline for filing has passed due to the plaintiff's reliance on his adversary's misconduct or misrepresentation."  Altopiedi, 834 F. Supp. at 806 (citing Irwin, 498 U.S. at 96; Kocian, 707 F.2d at 753).  Third, courts find equitable

tolling "where the plaintiff was prevented from asserting his rights in some 'extraordinary way.'" Id., at 806 (citing Kocian, 707 F.2d at 753).

In this case, there is no evidence to suggest that plaintiff actively pursued her PHRA charge of discrimination, but filed a defective pleading during the statutory period.  Plaintiff's election to dual file a charge of discrimination with the PHRC was made outside the statutory limitations period and there is no indication that it was defective.  Similarly, there is no evidence to demonstrate that plaintiff's failure to elect to dual file her PHRC claim during the statutory period was the result of defendant's misconduct or misrepresentation.  Finally, there is no indication the plaintiff was prevented, i.e. by bureaucratic delay, in an extraordinary way from exercising her rights under the PHRA.  See Altopiedi, 834 F. Supp. at 807 (holding that bureaucratic delay of the PHRC was an extraordinary circumstance that prevented him from filing on time).  The untimeliness was caused by plaintiff's electing to dual file after she filed her charge with the EEOC.  Thus, equitable tolling does not apply to this case and the 180-day statutory period under 16 PA. CODE § 42.14(a) will bar plaintiff's PHRA claim for hostile work environment.

A related concept is the continuing violations doctrine.  Defendant contends that the facts and circumstances of this case also do not warrant the tolling of the 180-day period under the continuing violations doctrine.  The Third Circuit Court of Appeals has used the continuing violations doctrine as an additional equitable exception to the timely filing requirement.  Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001) (citing West v. Phila. Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995)).  District courts have applied the doctrine to claims under the PHRA.  See generally Cortes v. R.I. Enters., Inc., 95 F. Supp. 2d 255, 263 (M.D. Pa. 2000).  Courts frequently construed the doctrine as a "narrow exception" to the timely filing requirement.  See

Voices for Independence v. Pa. Dep't of Transp., No. 06-78, 2007 WL 2905887, at *8 (W.D. Pa. Sept. 28, 2007) (citing MFS, Inc. v. Twp. of S. Anville, No. 05-1371, 2006 WL 3254535, at *3 (M.D. Pa. Nov. 9, 2006)).

The Supreme Court has held that a charge alleging a hostile work environment claim will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002) (plurality opinion). For purposes of demonstrating that the continuing violations doctrine applies to a hostile work environment claim, the plaintiff must first demonstrate that at least one act occurred within the filing period: The crucial question is whether any *present* violation exists. West, 45 F.3d at 754-55; see Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 481 (3d Cir. 1997) (plaintiff must first show that at least one discriminatory act occurred within the 300-day period). The plaintiff must also establish that the harassment is more than the occurrence of isolated or sporadic acts of intentional discrimination. West, 45 F.3d at 755. The relevant distinction is between the occurrence of isolated, intermittent acts of discrimination and a persistent on-going pattern. Id.

The rationale set forth in Berry v. Board of Supervisors of Louisiana State University, 715 F.2d 971 (5th Cir. 1983), is a helpful guide for a district court to use in determining whether a plaintiff has established a continuing violation. See, e.g., Rush, 113 F.3d at 481. The court of appeals in Berry enumerated three factors that should be considered:

> (1) subject matter--whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency--whether the acts are recurring or are more in the nature of isolated incidents; and (3) degree of permanence-- whether the act had a degree of permanence which should trigger the plaintiff's awareness of and [sic] duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.

Cowell, 263 F.3d at 292 (citing Berry, 715 F.2d at 981).  The consideration of "degree of permanence" is the most important of the factors.   Berry, 715 F.2d at 981.

Turning to the first Berry factor, plaintiff did not demonstrate that the subject matter of the discrimination she experienced at Horizon outside and during the limitations period was of the same type.  The record indicates that plaintiff engaged in sexual acts against her will with Meyn three times in October and November 2006, and a fourth time on or around March 6, 2007. Plaintiff alleges that the only additional sexual harassment from Meyn occurred on March 18, 2007, when he sent several text messages to plaintiff.  Assuming that these texts were similar in type to the prior sexual acts, they still fall outside the limitations period. See supra Part I.A.

The acts perpetrated by Horizon employees inside the limitations period are fundamentally different in kind from the sexual acts and sexual text messages.  The record is devoid of any sexual activity or communication of a sexual nature between Meyn and plaintiff during the limitations period.  The acts of alleged discrimination during the limitations period include: (1) a corrective action and performance management review issued by Leonard on June 8, 2007; (2) performance improvement plan issued by Leonard on August 7, 2007, after allegedly observing no real improvement in plaintiff's professional behavior; (3) plaintiff reporting to Leonard on August 7, 2007 that she was having problems with Meyn and Leonard responding by threatening plaintiff's employment; (4) shortly after September 11, 2007, Leonard inviting Meyn to eat lunch during a staff meeting at the Womancare center at which plaintiff was present, and; (5) Leonard sending an email to plaintiff on September 12, 2007 discussing problems with her time sheets and restricting her from working at home.

Taken together, these acts do not constitute the same type of discrimination that took place outside the limitations period.  None of these acts were sexual in nature, nor were they

committed by Meyn.  Cf. Sicalides v. Pathmark Stores, Inc., No. 99-3465, 2000 WL 760439, at

*5 (E.D. Pa. June 12, 2000) (continuing violation does not apply when incidents outside the time

period all involved sexual touching, but the incident during the time period involved an

ambiguous comment accompanied by a non-sexual nudge).  There are no acts constituting

plaintiff's claim for hostile work environment based upon sexual harassment that fall within the

time period.  Plaintiff argues throughout her pleadings and other submissions that the

employment reviews and correspondence with Leonard resulted from collaboration between

Meyn and Leonard to punish Yeager for refusing Meyn's sexual advances.  While this argument

may carry weight in a claim for retaliation, it has no place in the discussion of the continuing

violations doctrine.  Such a conspiracy is not similar to the type of conduct that occurred outside

the limitations period.  Plaintiff failed to satisfy the first Berry factor and is unable to

demonstrate a continuing violation.

For purposes of completeness, the court will briefly consider the two remaining factors

described in Berry.  Assuming arguendo that the first factor was satisfied, there is no indication

that the alleged discriminatory acts were of a recurring nature.  It should be noted that the courts

do not set a specific standard for determining how close together the acts must occur to amount

to a continuing violation.  Cowell, 263 F.3d at 295.  The kind of acts that would satisfy the

"frequency" factor of the Berry inquiry, however, must at least be acts of substantially similar

nature to those which were the basis of the original claim.  Id.

The time between the initial acts of sexual harassment in October and November 2006

and March 2007 was approximately four months.  After the last acts of sexual harassment – the

text messages – on March 18, 2007, there was no alleged discriminatory conduct until about

three months later in June 2007.  The absence of discriminatory activity between events leads the

court to conclude that the events in June 2007 and later were more akin to isolated, intermittent acts of discrimination rather than part of a persistent, on-going pattern.  Cf. Sicalides, 2000 WL 760439 at *6 (three-month hiatus between incidents prevented plaintiff from establishing requisite frequency); West, 45 F.3d at 755-56 (continuing violation found where incidents occurred consistently with increased frequency over time and without respite).

There is also evidence to suggest that the acts of sexual harassment had a degree of permanence, such that plaintiff should have been aware of a duty to assert her rights.  Plaintiff readily admits that the relationship between Meyn and herself was not consensual.  From the beginning of the nonconsensual relationship, plaintiff informed Meyn that his advances were not wanted.  Additionally, plaintiff was acting against her will on all four occasions where she engaged in oral sex with Meyn.

Plaintiff knew and communicated to Meyn as early as October 2006 that she was being forced against her will to perform oral sex.  This knowledge of the wrongfulness of the sexual harassment should have put plaintiff on notice to assert her rights against Meyn before September 2007.  See Voices for Independence, 2007 WL 2905887 at *10 ("'if prior events should have alerted a reasonable person to act at that time the continuing violation theory will not overcome the relevant statute of limitations'" (quoting King v. Twp. of E. Lampeter, 17 F. Supp. 2d 394, 416 (E.D. Pa.1998), aff'd, 182 F.3d 903 (3d Cir. 1999)); cf. Cowell, 263 F.3d at 295 (plaintiffs were aware of the wrongfulness of the liens when the liens were imposed in 1992 and 1993, and should have brought a claim to strike the liens within the applicable limitations period).

Viewing all evidence in the light most favorable to plaintiff, no reasonable jury could find that the three Berry factors have been satisfied and under those circumstances, the

continuing violations doctrine does apply in this case. Summary judgment must be granted in defendant's favor with respect to plaintiff's claim of hostile work environment under the PHRA.

## II.   Retaliation Claims

### A.  General Framework

In addition to asserting hostile work environment claims, plaintiff asserted retaliation claims under Title VII and the PHRA.  Defendant argues that these claims fail as a matter of law because plaintiff cannot demonstrate that (1) some of the acts complained of constitute adverse actions or (2) that there is a causal connection between her protected activity and the adverse action.  The same standards, decisional law, and analysis apply to retaliation claims under both statutes.  Slagle v. County of Clarion, 435 F.3d 262, 265 n.5 (3d Cir. 2006).

The antiretaliation provision of Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Retaliation claims brought under Title VII follow the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989).  The Jalil court outlined the burden-shifting framework as follows:

> Plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. Once the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to rebut the proof of discrimination by articulating some legitimate, nondiscriminatory reason for the employee's discharge. The ultimate burden of persuasion, which remains always with the plaintiff, may then be met by proving by a preponderance of the evidence that the alleged reasons proffered

> by the defendant were pretextual and that the defendant
> intentionally discriminated against the plaintiff.

Jalil, 873 F.2d at 706 (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).

### B. Prima Facie Case

In order to establish a prima facie case of retaliation, plaintiff must demonstrate that: (1) she engaged in protected activity; (2) her employer took adverse action after or contemporaneous with her protected activity; and (3) a causal link exists between her protected activity and the employer's adverse action.  Abramson v. William Patterson Coll. of N.J., 260 F.3d 265, 286 (3d Cir. 2001).

### 1. Protected Activity

The first prong of the prima facie case requires, at the very least, an informal protest of discriminatory employment practices.  Barber v. CSX Dist. Servs., 68 F.3d 694, 701-02 (3d Cir. 1995).  The protest, in whatever medium, must specifically relate to the protected conduct allegedly being infringed.  Barber, 68 F.3d at 701.  For purposes of defendant's partial motion for summary judgment, plaintiff engaged in protected activity when she complained of sexual harassment to Durniok in June and July 2007, complained of sexual harassment to Leonard in August 2007, filed her EEOC complaint on September 14, 2007, and filed her PHRC complaint on September 17, 2007.  The first prong of plaintiff's prima facie case for retaliation is satisfied.

### 2. Adverse Employment Action

The term "adverse employment action" in the context of retaliation claims traditionally was understood to refer to a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing significant change in benefits."  Weston v. Pennsylvania, 251 F.3d 420, 430-31 (3d Cir. 2001); see Pa. State Police v. Suders, 542 U.S.

28

129 (2004) (holding that under Title VII, a hostile work environment or constructive discharge may serve for adverse action).  The United States Supreme Court, however, in <u>Burlington Northern & Santa Fe Railway v. White</u>, 548 U.S. 53 (2006), interpreted the antiretaliation provisions of Title VII not to be limited to the traditional employment-related actions identified above.  <u>Id.</u> at 67-69.  Instead, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  <u>Id.</u> at 68.

In <u>Burlington Northern</u>, the Supreme Court stressed that an employment action is *materially* adverse when it is a significant, rather than trivial harm.  <u>Id.</u>  Specifically, "an employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  <u>Id.</u> (citing 1 BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 669 (3d ed. 1996) (observing that "courts have held that personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers" are not actionable)).  The Title VII antiretaliation provision seeks to provide plaintiffs with "unfettered access," free from interference by employers, to Title VII's remedial mechanisms. <u>Id.</u> (citing <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 346 (1997)).  To further this goal, the antiretaliation provision prohibits employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers.  <u>Id.</u> (citing <u>Robinson</u>, 519 U.S. at 346).  "[P]etty slights, minor annoyances, and simple lack of good manners" will not normally create such deterrence.  <u>Id.</u>

Plaintiff alleges several adverse employment actions occurred in retaliation for filing her original charge and complaining of sexual harassment.  Based upon the record before the court,

the court will analyze the following actions: (1) emails received by plaintiff from Leonard and threats made to plaintiff's employment; (2) discontinuation of plaintiff's ability to work from home, (3) Leonard's invitation to Meyn to eat lunch during a staff meeting at the Womancare Center and Meyn's sitting next to plaintiff, after plaintiff's EEOC complaint was faxed to Horizon on September 11, 2007; (4) the forcing of plaintiff onto a medical leave of absence; (4) the request made by Solo to plaintiff, while plaintiff was on leave, asking plaintiff to close the Womancare Center because she had keys; and (5) the termination of plaintiff from employment. The court will address each alleged adverse employment action.

### a. Emails and Employment Threats

On August 7, 2007, plaintiff was issued a performance improvement plan by her supervisor, Leonard, which among other things addressed the issue of inconsistencies with plaintiff's timesheet.  This performance improvement plan was issued on the same day that plaintiff told Leonard she was having problems with Meyn and that he was making sexual advances toward her.  Leonard responded to plaintiff by stating that she could either resign, or Leonard would terminate her and ruin her employment file.  Plaintiff spoke to Durniok regarding Leonard's threat, to which he responded, "nobody gets terminated without me saying so."  (J.S. ¶ 60; Pl.'s Dep. (Docket No. 36) at 118.)  Ten days after the performance improvement plan was issued, Leonard sent an email to plaintiff reiterating the inconsistencies with plaintiff's recorded time and time spent in her office.  (Pl.'s Dep. (Docket No. 32), Ex. 34.)  Additionally, she repeated a request that plaintiff not work at home. (Id.)  After about one month, Leonard sent plaintiff a final email on September 12, 2007 stating that because the timesheet inconsistencies had not been resolved, plaintiff would no longer be allowed to work at home, could only record

her hours at the Womancare Center or Birth Place, and must follow additional record keeping policies.  (Pl.'s Dep. (Docket No. 32), Ex. 33.)

Under those circumstances, the emails outlined above concerning the performance improvement plan and the threats from Leonard do not qualify as adverse employment actions as defined by the Supreme Court in <u>Burlington Northern</u>.  Plaintiff promptly brought the threat from Leonard to the attention of Durniok, who dismissed it by saying that only he had the authority to terminate employees.  Cf. <u>Sconfienza v. Verizon Pa. Inc.</u>, 307 F. App'x 619, 621-22 (3d Cir. 2008) ("formal reprimands that result in a notation in an employee's personnel file" could be considered an adverse employment action, "but harsh words that lack real consequences" do not).[8]

### b. Discontinuation of Privilege to Work at Home

The emails following the placement of plaintiff on the performance improvement plan and plaintiff's complaint of sexual harassment to Leonard on August 7, 2007 concerned discrepancies in plaintiff's timesheet, which allegedly resulted in the discontinuation of her privilege to work at home.  Plaintiff asserts that she had been allowed to work at home until Leonard's September 12, 2007 email barred the practice.  Plaintiff points to her being a single parent taking classes towards her master's degree at the time Leonard made the decision to restrict her work location.  This evidence suggests plaintiff could have endured significant

---

[8] Defendant argues that because plaintiff filed a complaint with the EEOC and PHRA in September 2007, and another complaint with the EEOC in April 2008, defendant's employment actions cannot be considered materially adverse pursuant to the standard outlined in <u>Burlington Northern</u>.  <u>See, e.g.</u>, <u>Sykes v. Pa. State Police</u>, No. 05-1349, 2007 WL 141064, at *7 (W.D. Pa. Jan. 17, 2007) (holding that employment actions were not materially adverse when plaintiff continued to pursue allegations of discrimination by filing two EEOC complaints and several internal claims with her employer), <u>aff'd</u>, 311 F. App'x 526 (3d Cir. 2008); <u>but see</u> <u>Henderson v. Lindamood</u>, No. 07-0055, 2008 WL 4190016, at *16 (M.D. Tenn. Sept. 5, 2008) (holding that standard "is whether a person of ordinary firmness would be deterred, not whether [plaintiff] himself actually was deterred," and rejecting the argument that "later filing of complaints or grievances against challenged action demonstrates that the challenged action was not sufficiently adverse to constitute an adverse action.") (citing <u>Thomas v. Eby</u>, 481 F.3d 434, 441 (6th Cir. 2007)). The court will not rely on defendant's line of reasoning to determine whether plaintiff subsequently exercising her rights precludes finding an adverse employment action.

hardship due to the change in working conditions.  Indeed, plaintiff left work two days after the September 12, 2007 email and remained on a medical and family leave of absence for the next six months.

Tellingly, when explaining why the standard for adverse employment actions must be phrased in general terms, the Supreme Court stated in <u>Burlington Northern</u>:

> [T]he significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters.  "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."

<u>Burlington Northern</u>, 548 U.S. at 69 (citing <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81-82 (1998)).  The Court described how a change in working conditions may affect certain workers: "A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children."  <u>Id.</u>

Viewing the evidence in a light most favorable to plaintiff, it is a question of fact for the jury to determine whether, a reasonable employee would find that being prohibited from working from home (the "workplace restriction") was materially adverse.  The court holds that there is a genuine issue of material fact with respect to whether the workplace restriction was an adverse employment action.

### c. Staff Meeting Lunch with Meyn

After plaintiff faxed the initial EEOC complaint to defendant, Leonard invited Meyn to a staff lunch at the Womancare Center, and he sat in the only open seat which was next to plaintiff. This incident does not rise to the level of a materially adverse employment action that would dissuade a reasonable employee from making or supporting a charge of discrimination.  A jury would have to speculate that Leonard purposefully created a situation where Meyn was required

to sit next to plaintiff.  Geraci v. Moody-Tottrup Intern., 905 F. Supp. 241, 247 (W.D. Pa. 1995) ("speculation unsupported by fact cannot create a genuine issue of fact precluding summary judgment."), aff'd, 82 F.3d 578 (3d Cir. 1996).  Simply being present at a meeting in a room with other individuals and sitting next to the alleged harasser, without more, could not be found by a reasonable jury to prevent a reasonable employee from making a charge of discrimination.

### d. Medical Leave of Absence

Plaintiff alleges that she was forced to take a medical leave of absence because defendant failed to take corrective action once it learned about the alleged sexual harassment.  Plaintiff tries to construe this lack of corrective action as an adverse employment action.  Plaintiff, however, did not point to any decision which holds that an employer's failure to take corrective action constitutes an adverse employment action under the antiretaliation provision of Title VII.[9]  Such inaction, which could foster a hostile work environment, Swenson v. Potter, 271 F.3d 1184, 1192 (9th Cir. 2001), does not necessarily affect the terms and conditions of employment for a claim of retaliation.  Under the circumstances, a reasonable employee would not find the inaction a materially adverse action.  See Burlington Northern, 548 U.S. at 70 (retaliation contemplates some affirmative action, i.e., a reassignment of employee from forklift duty to standard track laborer tasks or a 37-day suspension without pay, which were held to be adverse employment actions).

---

[9] Plaintiff directs the court's attention to Swenson v. Potter, 271 F.3d 1184 (9th Cir. 2001), proposing that defendant's failure to take corrective action once it learned of the alleged sexual harassment constitutes an adverse employment action.  The court's discussion of an employer's duty to take corrective action, however, did not apply to Title VII's antiretaliation provision or adverse employment actions; rather, the court's analysis focused on employer liability under a hostile work environment claim.  Swenson did not address a claim for retaliation.

Plaintiff did not argue that her taking medical leave was akin to a constructive discharge.[10]  Plaintiff took medical leave when she decided not to go to work as of September 14, 2007 and sought medical treatment allegedly due to sexual harassment, not retaliation.  The court cannot conclude that a reasonable jury would find that the alleged "forced medical leave" in this instance was an adverse employment action.

### e. Requiring Plaintiff to Close the Womancare Center

Plaintiff argues that defendant retaliated against her when she was asked by Marsha Solo to close the Womancare Center during her medical leave, as she had keys to the center.  This request cannot be viewed as an adverse employment action that would dissuade a reasonable employee from making a charge of discrimination.  Solo requested plaintiff to close the Womancare Center, because plaintiff was the only one at the time with keys.  The request had no bearing on plaintiff's employment considering that Solo had no knowledge about plaintiff's protected activity.  (J.S. ¶ 40; Pl.'s Dep. (Docket No. 32) at 135.)

### f. Termination

Plaintiff asserts that her termination from employment by defendant on April 4, 2008 constitutes an adverse employment action.  It is undisputed by the parties that this action was materially adverse to plaintiff's employment.

There are genuine issues of material fact with respect to two adverse actions: the discontinuation of the privilege to work from home, and plaintiff's termination.  The court will consider each of these adverse actions in the remaining analysis of plaintiff's prima facie case for retaliation.

---

[10] Plaintiff did not plead a constructive discharge claim.  A claim for constructive discharge requires a plaintiff to demonstrate "whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign."  Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001); see Stremple v. Nicholson, 289 F. App'x 571, 573-74 (3d Cir. 2008).

### 3.   Causal Connection

Defendant argues that plaintiff cannot establish the third element of a prima facie case of retaliation.  Defendant asserts plaintiff failed to adduce sufficient evidence to establish a causal connection between her protected activity and the adverse employment actions.  With respect to the existence of a causal link between plaintiff's protected activity and defendant's adverse actions, two factors are relevant: (1) timing and/or (2) evidence of ongoing antagonism. Abramson , 260 F.3d at 288 ("Temporal proximity . . . is sufficient to establish the causal link. [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.").

In the first factor, there must be a close temporal proximity between the protected activity and the adverse employment action.  Id.  While the court of appeals has not specified a strict formula for what is considered to be too long of a gap between protected activity and adverse action, courts have held that a time span of several months is too great.  See Williams v. Phila. Hous. Auth., 380 F.3d 751, 760 (3d Cir. 2004) (two months too long to permit an inference of causation); George v. Genuine Parts Co., No. 04-108, 2007 WL 217684, at *12 (W.D. Pa. Jan. 25, 2007) (finding that though suggestiveness is highly sensitive to the facts of each case, a three-month gap "is not so close as to be unusually suggestive of retaliatory motive, especially where an obvious and unimpeached non-retaliatory motive exists").  Timing, however, in connection with other types of suggestive evidence, is sufficient to demonstrate the causal link. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000); see Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997) (holding that "when temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus.").

### a. Causal Connection for Prohibition on Working from Home

In this case, the length of time between plaintiff's reporting to Leonard her claim of sexual harassment in August 2007 and the workplace restriction was about one month.  In light of Abramson, the court holds that there is a genuine issue of material fact for a jury to resolve whether the temporal proximity between the protected activity and the adverse employment action is sufficient to demonstrate the causal link.  See Carlson v. Twp. of Lower Alloways Creek, No. 06-3779, 2009 WL 2496523, at *9 (D.N.J. Aug. 12, 2009) (holding that one month between protected activity and adverse employment action was evidence of causation).

Even if timing alone is insufficient to establish causation, plaintiff presented sufficient additional evidence of defendant's antagonistic behavior.  The evidence that Leonard threatened plaintiff's employment and told plaintiff that she would ruin her employment file immediately after plaintiff reported the sexual harassment to Leonard is strong evidence of antagonism in direct response to plaintiff's protected activity.  On August 17, 2007, Leonard sent an email to Durniok and plaintiff reiterating inconsistencies in plaintiff's timesheets and requesting plaintiff not work at home. Viewed collectively, this evidence overcomes any doubt raised by the temporal separation of protected activity and the adverse employment action.  See Weston, 251 F.3d at 432.

### b. Causal Connection for Termination

The length of time between plaintiff's charge of discrimination in September 2007 and her discharge in April 2008, however, is too great to be unusually suggestive of retaliatory motive.  Plaintiff does not contend otherwise, but instead points to defendant's failure to take remedial action during her medical and personal leave as evidence of ongoing antagonism.

Plaintiff argues that she was prepared to return to work at the end of her leave of absence. She asserts, however, that because defendant never made an effort to alleviate the hostile work environment at Horizon, she could not return to work and was subsequently discharged. This argument fails to recognize that Durniok met with Meyn on September 13, 2007, discussed the complaint of sexual harassment and questioned him about the allegations. Durniok then instructed Meyn that he could no longer have any contact with plaintiff and to inform Durniok if she contacted him. This meeting took place one day before plaintiff left work to go on medical leave. These facts suggest that defendant made an effort to alleviate the hostile work environment at Horizon prior to plaintiff's leave of absence by restricting all contact between the two individuals.

Because she could not return to work at Horizon, plaintiff requested defendant transfer her employment to a different facility. She claims that defendant's refusal to grant the transfer request is evidence of antagonism. Durniok, however, could not grant the request because he did not have the authority to transfer or relocate employees outside of Horizon to other business units. Additionally, plaintiff's position as the health education specialist was based out of the Womancare Center, which is a stand-alone facility, and she did not bid on openings in other facilities. Plaintiff offered no evidence to refute these facts. It appears that no reasonable jury could conclude defendant's failure to transfer plaintiff was the result of an ongoing antagonistic effort of retaliation.

Viewing the facts in the light most favorable to plaintiff, a reasonable jury could not find a genuine issue of material fact with respect to whether the causation element was satisfied for retaliatory discharge. The temporal proximity – approximately seven months – between the protected activity and the adverse employment action is lacking in this case. See Williams, 380

37

F.3d at 760; George, 2007 WL at *12.   The court concludes that the element of causation is not satisfied with respect to her termination in April 2008.  Plaintiff, however, adduced sufficient evidence demonstrating a genuine issue of material fact with respect to whether a causal link exists between her protected activity and the adverse workplace restriction.  The court concludes a reasonable jury could find the plaintiff established a prima facie case of retaliation with respect to that restriction.

### C.  Burden-Shifting

Once a plaintiff has established a prima facie case, the burden shifts to the defendant to rebut the presumption of retaliation by producing evidence that the adverse employment action against the plaintiff was taken for reasons that are legitimate and nondiscriminatory.  Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 199 (3d Cir. 1996).   An employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a reason that was not discriminatory for the adverse employment decision.  Fuentes v. Perskie, 32 F.3d 759 at 763 (3d Cir. 1994); see generally St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).  It is not necessary for the defendant to persuade the court that it was actually motivated by the reason which it offers.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Bd. of Trs. Of Keene State Coll. v. Sweeney, 439 U.S. 24, 25 (1978).

Where defendant did not specifically offer a reason for restricting plaintiff from working at home, defendant asserted throughout its filings that the reason for preventing plaintiff from working at home was due to inconsistencies in timesheet recordings.  The issue of inconsistent timesheets was first raised in a performance improvement plan given by Leonard to plaintiff on August 7, 2007, the same day that plaintiff complained to Leonard about the sexual harassment.  The timesheet inconsistencies were again addressed in an email on August 17, 2007, and finally

on September 12, 2007, Leonard no longer permitted plaintiff to work from home as a result of ongoing timesheet inconsistencies.

Recognizing that the burden on defendant is light, and defendant can satisfy this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision," <u>Fuentes</u>, 32 F.3d at 763, the court is satisfied that defendant set forth a legitimate, nondiscriminatory reason for the adverse employment action taken against plaintiff.

### D.  Pretext

The last part of the analysis requires that, "[o]nce the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." <u>Fuentes</u>, 32 F.3d at 763.  Once the employer has stated a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff in order to survive summary judgment must satisfy at least one of the two prongs articulated by the United States Court of Appeals for the Third Circuit in <u>Fuentes</u>:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from which the fact-finder could reasonably either (1) disbelieve the employers articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

<u>Id.</u> at 764.

### 1.  Prong One

A plaintiff must submit evidence that could cause a reasonable factfinder to discredit the employer's articulated reason for the adverse employment action in order to overcome summary

judgment and bring her case to trial.  To discredit the employer's articulated reason, the plaintiff

does not need to produce evidence that necessarily leads to the conclusion that the employer

acted for discriminatory reasons, Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir.

1995), nor produce additional evidence beyond her prima facie case.  Fuentes, 32 F.3d at 764.  A

plaintiff must, however, demonstrate such:

> weaknesses, implausibilities, inconsistencies, incoherencies [sic],
> or contradictions in the employer's proffered legitimate reasons
> [such] that a reasonable factfinder could rationally find them
> "unworthy of credence" and hence infer that the proffered
> nondiscriminatory reason "did not actually motivate" the
> employer's action. [Fuentes, 32 F.3d] at 764-65 (quoting Ezold v.
> Wolf, Block, Schorr, and Solis-Cohen, 983 F.2d 509, 531 (3d Cir.
> 1992)).

 Simpson v. Kay Jewelers Div. of Sterling, Inc., 142 F.3d 639, 644 (3d Cir. 1998).

        The question asked in prong one of the Fuentes test is not whether the employer made the

best, or even a sound, business decision; it is whether the real reason for the adverse result

suffered by the plaintiff is discrimination.  Keller v. Orix Credit Alliance, 130 F.3d 1101, 1109

(3d Cir. 1997).  The court is neither permitted to get involved in the subjective business decisions

of the employer, nor set its own standards for the employer, unless there is evidence of

discrimination.  Ezold, 983 F.2d at 527.  "An employment decision that would create a problem

under prong one will likely turn on whether the stated reason for [adverse employment action] is

so implausible that a fact-finder could not believe it to [be] worthy of credence."  Orenge v.

Veneman, No. 04-297, 2006 WL 2711651, at *15 (W.D. Pa. Sept. 20, 2006); see Menta v. Cmty.

Coll. of Beaver County, 428 F. Supp. 2d 365, 374 (W.D. Pa. 2006).  An example of a stated

reason that a factfinder could find implausible and beyond belief was set forth in Brewer v.

Quaker State Oil Refining Corp., 72 F.3d 326 (3d Cir. 1995).  The employer stated the reason for

terminating the employee was because his sales performance was deficient, but the evidence on

the record demonstrated that the terminated employee was the leading salesperson in the region.
Id. at 330-32.

In the instant case, plaintiff did not explicitly argue pretext in any of her submissions, and defendant did not challenge whether a genuine issue of material fact exists with respect to this issue. Plaintiff, however, asserted throughout her filings that Leonard's threatening statement on August 7, 2007, coupled with the performance improvement plan and email relating to timesheet inconsistencies are evidence of defendant's discriminatory animus. Plaintiff additionally testified that Leonard knew and implicitly approved of the problems with plaintiff's time sheets long before Leonard raised the issue.

The statement by Leonard that she planned to "terminate" and "ruin" plaintiff's employment file was made in response to plaintiff reporting to Leonard about the sexual harassment. In subsequent weeks, the timesheet inconsistencies, which plaintiff claims had long been approved of, were now the basis upon which plaintiff was no longer permitted to work from home. The actions by Leonard after her threatening statement contradict defendant's proffered reason for the adverse employment action, namely that it was based solely on plaintiff's timesheet inconsistencies. Under these circumstances, a reasonable jury could find defendant's proffered reason "unworthy of credence" and infer that the alleged nondiscriminatory reason did not motivate defendant's action.

In light of the evidence in the record demonstrative of pretext and recognizing that all disputed facts must be viewed in the light most favorable to her and all reasonable inferences must be drawn in her favor, there is sufficient evidence for a reasonable factfinder to conclude defendant acted with retaliatory intent.

### 2.  Prong Two

Because plaintiff presented sufficient evidence under prong one of the <u>Fuentes</u> test to discredit defendant's proffered reason for the adverse employment action, the court need not address the second prong.

### *Conclusion*

Viewing all evidence in the light most favorable to plaintiff, the court concludes with respect to plaintiff's PHRA sexual harassment claim that the last alleged act of sexual harassment occurred more than 180 days from the filing date of plaintiff's PHRC complaint and equitable tolling does not apply to this case.  Additionally, because no reasonable jury could find that the three <u>Berry</u> factors were satisfied, the continuing violations doctrine would not apply.  Plaintiff's PHRA hostile work environment claim is time-barred and summary judgment must be granted in defendant's favor with respect to that claim.

After viewing the facts in the light most favorable to plaintiff, the court concludes with respect to plaintiff's retaliation claims that there are genuine issues of material fact with respect to whether the workplace restriction was an adverse employment action, whether the causation element of her retaliation claim could be satisfied and whether there is pretext.  These issues will need to be resolved by a jury.  Under these circumstances, the motion for summary judgment must be denied with respect to the retaliation claims based upon the workplace restriction.  The court concludes, however, that plaintiff did not adduce sufficient evidence to support her other retaliation claims and summary judgment must be granted in defendant's favor with respect to those claims.

By the court:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Date: March 17, 2010